IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| KELSEY DARLENE UNITS,<br>    Plaintiff,<br>vs.<br>KILOLO KIJAKAZI,<br>  Acting Commissioner of Social Security,<br>    Defendant. | Case No. 20-CV-3036-CJW-KEM<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Kelsey Darlene Units seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her applications for disability insurance (DI) benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f. Units argues that the administrative law judge (ALJ), Alison K. Brookins, erred by failing to include a shoulder impairment, depression, and right-hand carpal tunnel as severe impairments at step two; and in determining Units's residual functional capacity (RFC). I recommend **affirming** the Commissioner's decision.

### I.   BACKGROUND[1]

In December 2012, while Units was working full-time prepping wires for motor homes, she had bilateral carpal tunnel release surgery. Doc. 18; AR 53-55. In October and November 2013, she visited doctors through worker's compensation, complaining of right shoulder pain caused by passing stiff tubing at work; she received injections. AR 570-71. Magnetic resonance imaging (MRI) in January 2014 revealed degenerative

---

[1] For a more thorough overview, see the Joint Statement of Facts (Doc. 18).

changes in her shoulder joint. Doc. 18. She also complained of left thumb pain, and doctors determined she needed trigger thumb release surgery on her left thumb. *Id.* In March 2014, doctors operated on her thumb. *Id.* For a month or so after the surgery, Units was off work on worker's compensation. She never returned to work. She testified at the hearing in 2019 that she had already had two surgeries because of the toil of her job, and she feared if she continued working, she would end up needing more surgeries—particularly on her right shoulder. AR 54-55. But as the ALJ noted, she reported in 2018 that she quit her job due to a "a dislike for manufacturing work" and had not looked for work since, instead "focus[ing] on raising her children." AR 14, 767.

At the time she quit her job, Units had four school-aged children. *See* AR 48. In July 2014, she went to the doctor complaining of back pain and discovered she was pregnant. Doc. 18. She had a fifth child in April 2015 and a sixth child in August 2016. AR 325, 347. During her pregnancies, she could not treat her back pain with anything stronger than ibuprofen or acetaminophen. AR 39-40.

In July 2017, Units applied for DI and SSI benefits based on her back pain and right shoulder injury. *See* AR 69-70. She alleged disability since March 2014, when she had last worked. *Id.* The Social Security Administration denied Units's DI and SSI applications on initial review in December 2017 and again on reconsideration in June 2018. AR 65-122. In between those reviews, Units began taking medication for depression. *See* AR 263.

Units requested review before an ALJ, and the ALJ held a hearing by video on July 18, 2019. AR 10. On September 11, 2019, the ALJ issued a written opinion, following the five-step process outlined in the regulations.[2] AR 10-23. The ALJ found

---

[2] "The five-part test is whether the claimant is (1) currently employed and (2) severely impaired; (3) whether the impairment is or approximates a listed impairment; (4) whether the claimant can perform past relevant work; and if not, (5) whether the claimant can perform any other kind of work." **King v. Astrue**, 564 F.3d 978, 979 n.2 (8th Cir. 2009); *see also* **20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)**. The burden of persuasion always lies with the claimant to

2

Case 3:20-cv-03036-CJW-KEM    Document 24    Filed 02/01/22    Page 2 of 17

Units suffered from the following severe impairments: "degenerative disc disease of the lumbar spine, spondylosis at L4, mild degenerative joint disease of the right hip, obesity, and history of left carpal tunnel release surgery and trigger release surgery of the left thumb." AR 12. The ALJ found that Units suffered from depression but that it caused no "more than minimal limitation in [her] ability to perform basic mental work activities and [wa]s therefore non-severe." AR 13-15. The ALJ did not discuss Units's shoulder injury at step two. For purposes of determining Units's ability to perform her past work (at step four) and other work (at step five), the ALJ determined Units's RFC[3]:

> [She] has the [RFC] to perform sedentary work . . . except [she] can lift and/or carry 20 pounds occasionally and 10 pounds frequently. She can stand and/or walk for two hours in an eight hour workday, with normal breaks, and sit for six hours in an eight-hour workday with normal breaks. She should never climb ladders, ropes, or scaffolds. She can occasionally stoop, kneel, and crawl. She can frequently handle and finger on the left hand. She can tolerate frequent exposure to extreme cold.

AR 16. Based on her RFC, age, education, and work experience, the ALJ found that although Units could not perform her past work, other jobs existed in significant numbers in the national economy she could perform, including food and beverage order clerk, document specialist, and printed circuit board screener. AR 22. Thus, the ALJ found Units not disabled. AR 23.

Units appealed the ALJ's decision to the Appeals Council. The Appeals Council denied review on June 23, 2020 (AR 1-3), making the ALJ's decision the final decision of the Commissioner. *See* **20 C.F.R. §§ 404.981, 416.1481**. Units filed a timely complaint in this court, seeking judicial review of the Commissioner's decision (Docs.

---

prove disability, but during the fifth step, the burden of production shifts to the Commissioner to demonstrate "that the claimant retains the RFC to do other kinds of work[] and . . . that other work exists." ***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quoting ***Eichelberger v. Barnhart***, 390 F.3d 584, 591 (8th Cir. 2004)).

[3] RFC means "the most that a claimant can do despite her limitations." ***Sloan v. Saul***, 933 F.3d 946, 949 (8th Cir. 2019).

1, 3). *See* **20 C.F.R. § 422.210(c)**. The parties briefed the issues (Docs. 18-20, 22), and the Honorable C.J. Williams, United States District Judge for the Northern District of Iowa, referred this case to me for a Report and Recommendation.

## II. DISCUSSION

A court must affirm the ALJ's decision if it "is supported by substantial evidence in the record as a whole." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* **42 U.S.C. § 405(g)**. "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby*, 500 F.3d at 707. The court "do[es] not reweigh the evidence or review the factual record de novo." *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994). If, after reviewing the evidence, "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, [the court] must affirm the decision." *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992).

Units argues that the ALJ should have included her depression, right shoulder injury, and history of carpal tunnel in her right hand as severe impairments at step two. Units also argues that the ALJ's RFC determination should have included the need for extra breaks, working at a slow pace, limitations related to her right shoulder, an inability to use her hands frequently, and unscheduled absences more than two days a month.

### A. Severe Impairments

During step two, whether evaluating a physical or mental impairment, the ALJ must first "determine whether [a claimant] ha[s] a medically determinable . . . impairment[]" that "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." **20 C.F.R. §§ 404.1521, 416.921**. If the ALJ determines the claimant suffers from a medically determinable impairment, the ALJ must next decide

4

whether the impairment is severe by evaluating the degree of functional limitation caused by the impairment. *Id.*; **20 C.F.R. §§ 404.1522, 416.922**. An impairment is severe if it "significantly limits [the claimant's] physical or mental ability to do basic work activities,"—for example, the ability to walk, sit, lift, reach, understand and follow instructions, use judgment, or deal with changes in a routine work setting. **20 C.F.R. §§ 404.1520(c), 404.1522, 416.920(c), 416.922**. An impairment is not severe if it "would have no more than a minimal effect on the claimant's ability to work." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003) (quoting *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001)); *accord* **20 C.F.R. §§ 404.1522(a), 416.922(a)**. "Severity is not an onerous requirement for the claimant to meet" (and has been described as a de minimus standard), "but it is also not a toothless standard." *Kirby*, 500 F.3d at 708; *Hudson v. Bowen*, 870 F.2d 1392, 1395 (8th Cir. 1989).

Units challenges the ALJ's failure to include her shoulder impairment, carpal tunnel in her right hand, and depression as severe impairments.

### 1. Shoulder Impairment

The ALJ did not discuss a shoulder impairment at step two, despite Units alleging disability in her DI and SSI applications based on "right shoulder rotator cuff." AR 69. Units first complained of right shoulder pain in October 2013, which she reported was caused by passing stiff tubing at work (rather than a single event, like a fall). AR 570. She received a steroid injection. *Id.* A month later, she visited the worker's compensation doctor, continuing to complain of shoulder pain with overhead activities. *Id.* She reported that the injection helped for a week, that neither Naprosyn (naproxen) or ibuprofen helped, and that she had "some success" with Aleve (also naproxen). AR 570. She said she was still able to do her normal work activities but had pain. *Id.* On objective examination, the provider noted a positive impingement sign, tenderness, and "give away weakness . . . in both shoulders and all rotator cuff muscle groups." AR

5

570-71. The provider noted that the examination was "very embellished," that Units was "distracted and often looked to her husband for answers," and that "[t]here seems to be a discontinuity between what the patient says her job description is and what she is able to do today." AR 570. The doctor gave Units another steroid injection, instructed her to continue taking naproxen, and limited her to some light work duties. AR 571.

In December 2013, Units returned to the doctor, complaining of carpal tunnel and shoulder pain. AR 568. Units reported the steroid injection given at her last appointment was not of much benefit. *Id*. In January 2014, she reported that her right shoulder continued to "giv[e] her trouble" and that she still suffered pain despite steroid injections. AR 565. On objective examination, the provider noted that she had difficulty with forward extension and abduction and that her internal and external rotation were "somewhat limited." AR 566. Based on her complaints of shoulder pain and limited range of motion, the doctor ordered an MRI of her right shoulder. AR 563, 566. The MRI results were as follows: "1. Supraspinatus tendinopathy and/or internal partial tearing without a full-thickness tear identified. 2. Increased signal of the superior labrum. . . . Correlation for any signs on clinical exam is warranted. Bicipital anchor appears intact." AR 563. Units met with the doctor again in early February 2013, who noted the MRI "show[ed] a significant amount of tendinosis" and a "fair amount of degenerative acromioclavicular joint area," but no rotator cuff tear.[4] AR 561. The doctor noted they would "see how much the down time" (during recovery from thumb surgery) improved "her shoulder and then go from there," noting he would refer her to a different provider if she needed a shoulder consultation. *Id*.

Treatment records do not reflect that Units sought treatment for right shoulder pain again (although she did sometimes mention such pain). *See also* AR 41 (Units testified she had not "addressed [her shoulder pain] since" receiving injections and getting

---

[4] The doctor described it as the "left shoulder [MRI]," but he appeared to be interpreting the right shoulder MRI results.

6

an MRI). In November 2015, when seeing a doctor for right hip pain, she also reported right shoulder pain. AR 459. She also noted shoulder pain in February, March, and April 2017, when primarily complaining of back, hip, and right knee pain (the ALJ acknowledged the February 2017 treatment record noting complaints of shoulder pain in the RFC discussion). AR 19, 315, 366, 373. In addition, on objective examination at appointments in spring 2018, Units's chiropractor noted no pain bilaterally after shoulder depression. AR 782, 784, 786, 788, 790, 792.

Units argues that the ALJ erred in failing to include a shoulder impairment as a severe impairment at step two and by failing to limit her ability to reach in the RFC. She points to the MRI and abnormal objective examinations from prior to her alleged onset date, as well as her testimony (which the ALJ acknowledged in the RFC discussion) that her shoulders are in constant pain, that injections for her right shoulder helped only temporarily, and that since suffering the shoulder injury at work, she cannot reach above her head and must use only her left hand to wash her hair. AR 17, 37, 40-42. But the ALJ did not fully credit Units's testimony, noting that treatment records and function reports reflected much less limited activities of daily living. *See* AR 20. In function reports completed in September 2017 and March 2018, Units did not mark that her ability to reach was limited, and she also reported no difficulties with hair care or bathing. AR 253, 257, 269, 273. Indeed, in those function reports, she did not report shoulder pain or any shoulder injury, despite testifying that her shoulder pain had remained constant since 2014.

Based on this record, I agree with the Commissioner that any error by the ALJ in failing to discuss Units's shoulder injury at step two was harmless. *See* **Cuthrell v. Astrue**, 702 F.3d 1114, 1118 (8th Cir. 2013) (collecting cases holding that the harmless-error doctrine applies at step two when there is "no sufficient evidence that the impairment was severe"); *see also* **Sumners v. Astrue**, No. 09-5065-CV-S-RED-SSA, 2010 WL 2955367, at *2 (W.D. Mo. July 23, 2010)**.** The record overwhelmingly

7

supports the ALJ's decision not to include RFC limitations related to a shoulder impairment (and to discount Units's testimony regarding shoulder pain limitations). I recommend finding that the ALJ did not err at step two by failing to include a severe shoulder impairment.

### 2. *Carpal Tunnel in Right Hand*

The ALJ included as severe impairments at step two "history of left carpal tunnel release surgery and trigger release surgery of the left thumb." AR 12. Units argues that the ALJ erred by failing to include history of *bilateral* carpal tunnel release surgery as a severe impairment, as well as corresponding right-hand RFC limitations.

Units had carpal tunnel release surgery on both hands in December 2012. Doc. 18. At follow-up appointments in April and December 2013, she reported the surgery improved her symptoms, but she still felt some tingling in her fingertips (but no pain). AR 568, 572. She was able to return to work on full duty after the surgery. AR 572-73.

During the relevant time period, Units did not complain of or seek treatment for issues with her right hand. *See* Doc. 18. Indeed, when noting issues with her left thumb at an appointment in October 2017, she reported lifting her children with her right hand and left forearm, and the doctor noted the grip strength in her left hand was diminished as compared to the right. *See* AR 586-87.

In arguing that she suffers limitations in her right hand, Units relies on treatment records related to her left thumb, as well as her testimony that she cannot grip things for a long time and still drops things. AR 42. The ALJ did not fully credit Units's testimony, however, finding it inconsistent with the treatment records, her activities of daily living, and the statements in her function reports. AR 17-20. Indeed, in function reports completed in September 2017 and March 2018, Units did not indicate any limitations with using her hands. AR 257, 273.

8

The record does not support that Units suffered RFC limitations related to her right hand. Because the record overwhelmingly supports that Units did not suffer greater than minimal limitations in her right hand, as required for an impairment to be severe, I recommend finding that the ALJ did not err in failing to include history of right-hand carpal tunnel surgery as a severe impairment at step two (and that any error in failing to discuss this impairment was harmless).

### 3. *Depression*

The ALJ must apply a "special technique" to evaluate the severity of mental impairments, considering the claimant's limitations in "four broad functional areas . . . : [u]nderstand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself." **20 C.F.R. §§ 404.1520a(c)(3), 416.920a(c)(3)**. Although subject to exception, as a general rule, if the claimant suffers no more than mild limitations in each category, the claimant's mental impairments are not severe. **20 C.F.R. §§ 404.1520a(d)(1)**, **416.920a(d)(1)**. Here, the ALJ found that Units suffered from depression but found it nonsevere. AR 13-15. The ALJ applied the special technique for mental impairments, finding Units suffered no limitations in interacting with others and adapting or managing herself and only mild limitations in understanding, remembering, or applying information and in concentrating, persisting, or maintaining pace. AR 13-14.

Units did not allege disability based on mental impairment in her initial DI and SSI applications. In a function report completed in September 2017, she noted she could pay attention "pretty well," follow written and oral instructions "very well," handle stress and changes in routine "pretty well," and get along with people. AR 257-58. After her disability applications were denied on initial review in December 2017, she was prescribed Zoloft (sertraline). *See* AR 263, 575. On February 14, 2018, at a follow-up appointment with her primary care provider related to her sertraline prescription, she

9

"state[d] the medication is working well," but "it 'zones' her out, so she takes it at nighttime." AR 575. She reported some days where she did not want to get out of bed to take her kids to school and "strongly relat[ing] poor mood and irritability to pain issues." *Id.* On objective examination, her primary care provider noted well groomed, good eye contact, normal psychomotor, normal behavior, full affect congruent to mood, and linear and goal-directed thought processes. AR 576. The provider continued sertraline and added Cymbalta (duloxetine). *Id.*

At a follow-up appointment with her primary care provider in April 2018, the provider noted Units's depression "[wa]s strongly characterized by irritability and moodiness toward her family." AR 763. Units reported "doing better" since adding the Cymbalta, which she "really like[d]" and which "helped her moodiness, energy, and motivation." *Id.* She reported waking up feeling groggy and medicated due to Zoloft. *Id.* On objective examination, her primary care provider once again noted a normal psychological examination: well groomed, good eye contact, normal psychomotor and behavior, euthymic mood, full affect congruent to mood, and linear and goal-directed thought processes. AR 764. Her provider discontinued Zoloft and increased the Cymbalta dosage. *Id.*

In May 2018, Units met with psychologist Stephen Holbrook, PsyD, for a consultative examination ordered by the Social Security Administration. AR 767-69. "[S]he report[ed] a positive response to [medications] and an overall decrease in her depressive symptoms" (including improved frustration tolerance and decreased irritability). AR 768. She rated her typical mood 5/10 (with 10 being the best), noting that six or seven months ago she would have rated it 2/10. *Id.* On a depression screening, her answers reflected moderately severe depression, and on an anxiety screening, her answers fell in the mild to moderate range. *Id.* On objective examination, Dr. Holbrook noted she was pleasant and cooperative; she appeared likeable and friendly without abrasive personality traits; her conversational ability showed no signs of inattention or

10

being easily distracted; and she successfully completed tests to measure her attention and concentration (such as spelling "world" backwards and recalling three words after a five-minute delay). AR 768-69. Dr. Holbrook concluded that her depression and anxiety symptoms were improving with medication and did "not in and of themselves appear to be of disabling proportions with regards to her ability to work." AR 769. He concluded she could understand simple work-related instructions, sustain attention, and "would not likely have problems learning workplace instructions, procedures or routines." *Id*. He did note, however, that "[p]roblems of slower pace may be evident." *Id*.

Units did not seek further mental-health treatment during the relevant time period. At a June 2019 appointment with her primary care provider for back pain, however, she did complete depression and anxiety screenings. AR 796-97. She reported mental-health symptoms over the last two weeks, such as feeling down or depressed, more than half the time and being unable to stop worrying nearly every day. *Id*. She described her mood as "okay" at that appointment. AR 798. Other treatment records (prior to January 2018) reflect Units denied depression, anxiety, or mood problems during the review of systems. *See* 368, 385, 461, 673. Also, as the ALJ noted, providers consistently noted normal mental status examinations, including normal mood, affect, insight, judgment, and memory. *See* AR 13-14, 318, 369, 376, 454, 462, 532, 584, 673, 764, 798.

Substantial evidence supports the ALJ's determination that Units's mental symptoms improved with medication and that they caused no more than minimal effect on her functioning. AR 15. Accordingly, I recommend finding that the ALJ did not err in determining Units's depression was nonsevere.

### B. RFC

Units argues that the RFC should have included the need for extra breaks and unscheduled absences more than two days a month, as well as greater limitations related

to her left hand.[5]  In support, Units primarily relies on her testimony from the hearing.

When evaluating the credibility of a claimant's subjective complaints—including pain or nervousness—the ALJ must consider the factors set forth in *Polaski v. Heckler*: "(1) the claimant's daily activities; (2) the duration, frequency and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions." ***Black v. Apfel***, 143 F.3d 383, 386 (8th Cir. 1998); *accord* ***Polaski***, 739 F.2d 1320, 1321-22 (8th Cir. 1984), *vacated*, 476 U.S. 1167 (1986), *reinstated*,[6] 804 F.2d 456 (8th Cir. 1986).  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints." ***Black***, 143 F.3d at 386.  The ALJ may not discredit the claimant's allegations based solely on the absence of objective medical evidence, but the ALJ may rest his credibility finding on "objective medical evidence to the contrary," ***Ramirez v. Barnhart***, 292 F.3d 576, 581 (8th Cir. 2002); or "inconsistencies in the record as a whole," ***Brockman v. Sullivan***, 987 F.2d 1344, 1346 (8th Cir. 1993).  Courts must "defer to an ALJ's credibility finding as long as the 'ALJ explicitly discredits a claimant's testimony and gives a good reason for doing so.'" ***Schultz v. Astrue***, 479 F.3d 979, 983 (8th Cir. 2007) (quoting ***Hogan v. Apfel***, 239 F.3d 958, 962 (8th Cir. 2001)).

At the hearing, Units testified that constant back pain prevents her from working. AR 37.  She said she could stand for only twenty minutes at a time and sit for thirty minutes at a time before her back began to bother her.  AR 44-45.  She testified that she did not belong to any social groups or churches, but when pressed by her attorney, she admitted going to church sometimes but stated she can sit through only half the service before having to get up and walk around.  AR 50.  She said when she goes grocery

---

[5] Units also argues that the RFC should have included limitations related to her right shoulder, right hand, and depression, which were discussed in the previous section.

[6] The court did not explicitly say that it was reinstating the original *Polaski* opinion, but the Eighth Circuit has recognized that it "effectively reinstat[ed]" *Polaski*. ***Jones v. Callahan***, 122 F.3d 1148, 1151 n.3 (8th Cir. 1997).

12

shopping, her kids put items in the cart for her. AR 51. She also testified that she takes many breaks when doing chores and has help from her older children. AR 47-48.

In function reports completed in September 2017 and March 2018, Units similarly reported not being able to stand or walk for long periods. AR 257, 273. She reported not being able to sit for a "long period of time" in September 2017, but she did not mark any issues with sitting in March 2018. *Id.* As the ALJ noted, Units reported much greater activities of daily living in her function reports than at the hearing. AR 20. She reported attending to her children's needs all day long, two of whom were in diapers; cooking complete meals daily that took thirty minutes to an hour (with some help prepping from her older children and husband); cleaning; doing laundry every two days; going shopping every other week for thirty minutes to an hour; driving her children to school; and going to bible study, to church, on date nights with her husband, and to her children's sporting events on a regular basis. AR 252-59, 268-75. As the ALJ noted, Units told one of her doctors in September 2018 that she was walking three miles a day and doing yoga most days. AR 20, 771. Other treatment records reflect that Units reported other activities: walking three to four times a week (July 2014; AR 512); that she used to go to the gym two to three times a week but stopped when her back pain worsened and that "[s]he is now able to keep up with house work – cooking, laundry, etc.," but does no extra exercise (February 2018; AR 575); that she had to "push the low back hard" to perform activities of daily living, such as laundry, and some days could not (April 2018; AR 782); and that she cooked some and did laundry and housework most days, using pacing to help with chores, and was an active parent to her young children (May 2018; AR 769). Substantial evidence supports the ALJ's determination that Units's activities of daily living are inconsistent with her testimony of limitations caused by her back pain (AR 20). *See* **Guilliams v. Barnhart**, 393 F.3d 798, 802 (8th Cir. 2005) ("Significant daily activities may be inconsistent with claims of disabling pain . . . .").

13

The ALJ summarized the treatment records, noting the gaps in treatment. *See* AR 18-20; Doc. 18; *see also* AR 796 (reporting suffering back pain for only the last nine to ten months in June 2019). The treatment records also reflect mostly normal objective examinations (besides tenderness), including normal range of motion, strength, gait, and (mostly) negative straight leg raise tests. AR 18-20, 318, 369, 385, 454, 461-62, 503, 508, 515, 532, 673. The Eighth Circuit has recognized that medical evidence of "normal motor strength, normal gait, normal range of motions, and capacity to do straight leg raises without much difficulty," in combination with other factors, supports discrediting a claimant's testimony of "weakness, constant [back] pain, and muscle spasms." ***Castro v. Barnhart***, 119 F. App'x 840, 842, 844 (8th Cir. 2005) (per curiam) (affirming ALJ's credibility finding based on inconsistencies with the medical evidence, the claimant's daily activities, and the lack of treatment and medications sought by claimant). In addition, in June 2019, Units reported that her pain improved with sitting (and leaning forward), and during the psychological consultative examination, Dr. Holbrook observed she was able to sit comfortably for the entire appointment. AR 768, 796. Overall, I recommend finding substantial evidence supports the ALJ's determination that Units could perform sedentary work and that her back pain was not so severe that she would need extra breaks or unexcused absences.

With regard to her left hand, Units had carpal tunnel release surgery in December 2012. Doc. 18. At follow-up appointments in April and December 2013, she reported some tingling in her fingertips but no pain. *Id.* In November 2013 and January 2014, she complained of left thumb pain, and doctors recommended trigger thumb release surgery. *Id.* Doctors operated on Units's left thumb on March 10, 2014. *Id.* She had follow-up appointments on March 21, March 31, and April 21. *Id.* She reported doing well after surgery but still had some numbness and tingling in her thumb (but did have sensation). *Id.*; AR 555.

14

Units did not seek treatment for or complain of issues with her left hand again until October 2017. Doc. 18. At that appointment, she reported being pain free for some time after the trigger release surgery but stated her thumb had begun to ache over the last year, and it was getting progressively worse. AR 586. She reported daily pain limiting her activities, noting she had to lift her children with her right hand and left forearm. *Id*. On objective examination, her primary care provider noted a negative Finkelstein's test but diminished grip strength of the left hand compared to the right due to pain. AR 587. The doctor ordered x-rays of Units's left hand and referred Units to a specialist. *Id*. Units met with the specialist in December 2017, who reviewed the x-rays and noted they "are normal" but showed "mild radial subluxation of the metacarpal upon the trapezium" (lower thumb bone slightly out of place). AR 550. The specialist opined that Units had carpometacarpal joint arthritis in her left thumb. *Id*. He recommended Units exercise, lose weight, and modify her lifestyle to minimize the stress on her thumb, such as by no longer opening jars or tearing open bags. *Id*. He was "optimistic" this would improve her arthritis without the need for surgery (which he could perform in the event she failed nonsurgical treatment). *Id*. He did not think any of her pain was due to triggering, noting she had "excellent motion of the flexor tendon." *Id*. He gave Units a steroid injection and a thumb splint to wear. *Id*.

Units returned to the specialist two months later in January 2018. AR 548. Units reported that "her thumb has been feeling much better" since the steroid injection, noting the "splint was helping as well, but she lost it a couple of weeks ago and has not been using it since." *Id*. Units also reported a lump on her left palm near her ring finger that "can occasionally be painful." *Id*. On objective examination, the doctor observed the lump and noted "full digital range of motion." *Id*. He also obtained new x-rays of her left hand, which "show[ed] Eaton stage II osteoarthrosis of the left thumb carpometacarpal . . . joint." AR 548, 578. The doctor noted Units "[wa]s doing symptomatically better" with her left thumb, and he "emphasized the importance of using

15

her splint, as well as modifying her activities and losing weight" to decrease the stress on her thumb. AR 548-49. He also noted he could surgically remove the lump on her hand, discussing the risks and benefits, and Units decided to "just leave that alone for now." AR 549. The doctor noted he would see Units again as needed. *Id.* The treatment records do not reflect that Units obtained any additional treatment for her left hand or that she further complained of hand pain. Doc. 18.

Units argues that she could not frequently handle and finger with her left hand, as found by the ALJ. AR 16. She relies on her testimony that her hands fall asleep, and she loses her grip on things; she drops things; her hands get tingly and numb; and her thumb makes it difficult to open jars. AR 37, 42-44. She also points to the specialist's recommendation that she avoid opening bags and jars. But as the ALJ noted, Units's activities of daily living are extensive. And in function reports completed in September 2017 and March 2018, Units reported no limitations related to using her hands. AR 257, 273. Overall, I recommend finding that substantial evidence supports the ALJ's determination not to include greater limitations related to handling and fingering in the RFC.

### III. CONCLUSION

I recommend **affirming** the Commissioner's decision.

Objections to this Report and Recommendation must be filed within fourteen days of service in accordance with 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b). Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. Fed. R. Civ. P. 72. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and

Recommendation, as well as the right to appeal from the findings of fact contained therein. *See United States v. Wise*, 588 F.3d 531, 537 n.5 (8th Cir. 2009).

**DONE AND ENTERED** on February 1, 2022.

_Kelly K.E. Mahoney_
Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa